Gloria B. RACKLEY, Plaintiff,

v.

SCHOOL DISTRICT NUMBER 5, ORANGEBURG COUNTY, SOUTH CAROLINA, a public body corporate, and Larry R. Wells, Chairman of the Board of Trustees of School District Number 5, Orangeburg County, Dr. Harvey Atwill, Jr., R. S. Williams, Jr., Talley Smith, and Edgar Culler, Members of the Board of Trustees of School District Number 5, Orangeburg County, South Carolina, and H. A. Marshall, Superintendent of School District Number 5, Orangeburg County, South Carolina, Defendants.

Civ. A. No. 8458.

United States District Court
D. South Carolina,
Orangeburg Division.

Sept. 16, 1966.

Matthew J. Perry, Lincoln C. Jenkins, Jr., Columbia, S. C., Earl W. Coblyn, Zack E. Townsend, Orangeburg, S. C., Jack Greenberg, New York City, for plaintiff.

Hugo S. Sims, Jr., Sims & Sims, C. Walker Limehouse, Orangeburg, S. C., for defendants.

## ORDER

SIMONS, District Judge.

This is a suit in equity wherein the plaintiff prays for a preliminary and permanent injunction enjoining School District No. 5, Orangeburg County, South Carolina, its members and its Superintendent, from refusing to reinstate plaintiff, Gloria B. Rackley, to her position as a teacher in the school systems of School District No. 5, Orangeburg County, because she has from time to time engaged in certain activities protected by the United States Constitution, and to enjoin the defendants from withholding from the plaintiff all salaries, expenses and emoluments which rightfully accrue to her on account of said employment,

and from offering plaintiff a contract to teach in the defendant school system on this account.

The defendant by answer admitted that on October 7, 1963 H. A. Marshall, Superintendent of District No. 5, wrote the plaintiff as follows:

"Dear Mrs. Rackley:

"The purpose of this letter is to confirm to you in writing the fact that I have this day relieved you of all duties in connection with your position as a teacher in School District Number 5, Orangeburg County.

"This is also to notify you that I intend to recommend to the board of trustees at its next meeting on Monday, October 14, 1963, that they discharge you for cause. If you desire a hearing before the board concerning this matter, please advise me in writing by October 11, 1963.

"My recommendation to the board that you be discharged is based on an investigation into your personal conduct which revealed, among other things, that:

"(1) You were a leader and spokesman of a group of approximately two hundred demonstrators who breached the peace of the community on September 28, 1963, and that your conduct was such that it encouraged juveniles to break the law, jeer at policemen, promote violence, and disturb good order and public tranquility.

"(2) You have been arrested a number of times recently for trespassing on the property of other people, including once in Orangeburg on August 31, 1963, and once in Charleston on June 13, 1963.

"(3) You were arrested on September 7, 1963, for distributing handbills on the streets of Orangeburg in violation of a city ordinance.

"It would appear that you have become so rabid in your desire for social reform that you are advocating breaking the law as a means of calling attention to what you consider your

grievances. A teacher in the public schools cannot advocate lawlessness without destroying her usefulness in teaching young people.

> "Sincerely yours,
> "H. A. Marshall
> "Superintendent."

Jurisdiction is based upon Title 28 U.S.C. § 1343(3), Title 42 U.S.C. §§ 1981, 1983, 1985 and the First, Fifth, Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution of the United States. The sole issue is whether the defendant School Board, exercising its discretionary powers under the facts here, was justified in terminating the employment of plaintiff for cause during the school year 1963–64 while she was under contract and in failing to offer her reemployment as a teacher in subsequent years. This case was heard on September 2, 1965,[1] and from the evidence presented the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Plaintiff is a Negro citizen of the United States, and at the commencement of this action was a citizen of South Carolina residing at Orangeburg, South Carolina. By vocation she is a school teacher holding Bachelor and Master of Science Degrees. In plaintiff's employment in School District No. 5 her capability and performance was characterized as "excellent". Her classroom performance, attitude, and relation to her superiors were unquestioned,[2] there being no contention on the part of defendants that she was not a very capable, qualified and competent classroom teacher.

2. Plaintiff was an active member of the National Association for the Advancement of Colored People, and was an ardent leader in the civil rights movement in Orangeburg County and other areas of South Carolina. She engaged in peaceful picketing and demonstrations designed to end segregated practices in places of public accommodation such as hospitals, lunch counters, hotel dining rooms, and public restrooms. As a consequence of her participation in these demonstrations plaintiff was arrested on several occasions and charged with various offenses including breach of peace, trespass, and distributing handbills. She was adjudged guilty in the cases that were tried and appealed in all instances. These appeals were still outstanding when the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq., was signed into law on July 2, 1964. Other charges in the City of Orangeburg have never been brought to trial.

3. For the school year 1963–64 plaintiff's salary was $4845, of which she was paid a total of $780.39 for twenty-nine days' work. She was discharged "for cause" by the Board of Trustees, upon recommendation of the Superintendent, effective October 15, 1963, by letter of L. R. Wells, Chairman of the Board of Trustees of defendant School District. She has not been paid the balance of her salary, to wit, the sum of $4064.61

---

1. The court's determination of this matter was delayed upon request of counsel for the parties who conducted extensive settlement negotiations it appearing that the matter would be settled by compromise eliminating the necessity of a determination of the issues by this court. After it appeared that a settlement could not be consummated counsel for the parties submitted briefs to the court during August 1966.

2. When plaintiff was questioned by her counsel on direct examination to testify concerning her attitude toward her pupils and toward her teaching duties, the following statement was made to the court by Mr. Henry Sims, Counsel for defendants:

"MR. SIMS: Your Honor, just in an effort to expedite this, there has been no question of her qualifications, and I believe the depositions show that there is no question as to her conduct in the classroom, as such.

"THE COURT: What you are saying, Mr. Sims, is that the defendants are not questioning her capacity as a classroom teacher.

"MR. SIMS: That is correct.

"THE COURT: And her efficiency as a classroom teacher.

"MR. SIMS: That is correct, your Honor; that is not a contention in this case."

according to her contract with the School District for the school year 1963–64. Subsequent to her discharge, she has not been offered reemployment by the School Board for any later school year. During the period from October 1963 to September 1964 she was employed by the National Association for the Advancement of Colored People for a total of ten weeks on a part-time basis earning a total of $900 for this employment. In September 1964 she began teaching at Norfolk State College in Norfolk, Virginia at $6500 per year, substantially more than she had received as a teacher in School District No. 5. She has continued to teach there at a salary considerably in excess of the salary she received while teaching in the Orangeburg public schools; thus, beginning with the school year 1964–65 she has suffered no monetary damages as a result of the termination of her employment by defendants. Nevertheless, at the hearing before the court, plaintiff testified that she wanted to return to her home in Orangeburg and again teach school there.

4. Although plaintiff's contract was ultimately terminated by the Board of Trustees of School District No. 5, the actual determination to fire Mrs. Rackley was instigated by the Superintendent, H. A. Marshall, who recommended to the Board of Trustees that she be discharged for the reasons stated in his letter of October 7, 1963 to plaintiff, supra. Although the Superintendent testified *inter alia* that plaintiff's contract had been terminated because she had left an extra-curricular teacher's workshop early so as to participate in civil rights activities, thereby implying that her duties as a teacher were neglected, it is obvious that the real complaint against plaintiff was her civil rights activities.[3] Defendant's failure to offer plaintiff a teaching posi-

3. Testimony of Superintendent H. A. Marshall on direct examination, pp. 119–122 of Transcript:

"Q. Will you state the procedure which you followed in recommending her dismissal to the Board of Trustees for this School District.

"A. Well I gave it some thought and prepared a letter, which has been handed in as an exhibit, which laid out the reasons that I was taking that action. And then I arranged an interview with her, and she came to my office on the afternoon of October 7, and I discussed with her the purpose of her being there and explained that why and also that I was planning to recommend to the Board of Education that she be dismissed at the next meeting on October 14. And after we discussed it, I handed her a copy of the letter, which she took with her, and stated that she could appear before the Board. And she asked the question about whether she was still on the payroll, and I told her of course she was until October 14, and if the Board did not follow my recommendation she would still be on the payroll.

"Q. It was not your prerogative or power then to fire her; you made a recommendation to the Board of Trustees, and they took the action?

"A. That's right.

"Q. The record has a copy of your letter. Will you go into the details which you set out in that letter as the reasons for dismissing her.

"A. Well in that letter we have several specific things and three of them include four situations which arose when she was arrested. One of them was on the 13th in Charleston, and August the 31st in Orangeburg; then September the 7th, I believe it was, in Orangeburg; and then again on September 28th. And in that letter I explained and I made the statement "and among other things." And the "among other things" had to do with things, you might say, leading up to this, and becoming a final part of the action. My first experience with Mrs. Rackley was after the arrest around at the hospital on October 12, and then again on October 26, and that came about—

"THE COURT: What year was that?

"A. 1961. And that came about because her daughter, who I think was in the physical education class in high school injured a finger and someone had her sent to the hospital, and the daughter became a little hysterical. So they called, I believe, Mr. Pearson, and he notified her and she went to the hospital. Well some scene took place there to the point that it created some disturbance. I am not sure exactly what it was. And then again on the 26th, when she went back for, I imagine, a checkup by the doctor, to see the progress that the child was making. And so in the spring, as a re-

tion for the 1964–65, 1965–66, and 1966–67 school years was for the same reason.

5. Plaintiff was initially employed by defendant school district as a substitute teacher in the early part of the 1958–59 school year. She completed the last semester of that school year as a full-time teacher. She was employed as a full-time teacher from that time until her employment was terminated October 15, 1963.

6. Defendant school district's first dissatisfaction with plaintiff occurred as a result of an injury to plaintiff's fourteen year old daughter on October 12, 1961. (See testimony of Superintendent Marshall in Note 3, supra.) Following the injury plaintiff took her daughter to the Orangeburg Regional Hospital. After their arrival she was subsequently shown to a waiting room. Without explanation to her she was later directed to another waiting room reserved for colored persons. She refused to enter and returned to the white waiting room. When the police arrived she went into the hall and left with her daughter without further incident some minutes later. Two weeks thereafter when plaintiff returned her daughter to the hospital for further treatment, the same incident occurred but this time plaintiff refused to leave, whereupon both plaintiff and her daughter were arrested for "disturbing the business of the hospital."

7. The following spring, Superintendent Marshall held up her employment contract for 1962–63 until he could counsel her. He explained that what had happened was "embarrassing to the school system and particularly to our profession." He testified that there were no unpleasantries, but "caution[ed] her in terms of the image that is created on the part of a professional group of people like teachers." The next day plaintiff received a letter notifying her that she had been elected for another year's employment. Plaintiff and her daughter later brought a class action that resulted in a desegregation of the entire hospital facility. See Rackley v. Board of Trustees of the Orangeburg Regional Hosp., D.C., 238 F.Supp. 512 (1965).

sult of that, in the spring when we re-elected teachers, she was reelected at the same time that the other teachers were reelected, but I did hold up her letter until I could have a conference with her. And when I had the conference with her, I was approaching it from the standpoint that the kind of thing that had happened there was embarrassing to the school system and particularly to our profession. And we talked about it a little bit. She was very honest about it, and I think I was honest. There were no unpleasantries, but I did gather right then that she had said what she meant, so I accepted it. But I had done what I wanted to do and that was to caution her in terms of the image that is created on the part of a professional group of people like teachers. And the next day I mailed her letter to her, of election. And of course the next year, she was elected at the same time as she was the prior time, and the letter went out at the same time. And that was done because the conference I had with her had served its purpose as far as I was concerned, because I was convinced that she had her ideas and what I had to say wasn't going to do much about it. And then the next year, in '63, the summer that things began to build up here in tempo, I learned that a good many teachers—when I say a good many—I don't know the exact number—were participating in some of these demonstrations or marches downtown, and I just began to investigate at the Police Department to just determine if I could who they were also what they might be doing, and whether or not we had high school students or junior high school students, or elementary students in the group. And that was all I did. I just made an investigation. In fact, my letter said 'investigations' which were made. And so in the summer of 1963, when she was arrested in Charleston and her picture was in the paper,—I don't think her name was correct, however, but someone called my attention that that was Mrs. Rackley. And for some reason, several others called my attention to it. But I said nothing about that, because it was embarrassing to me. Maybe it shouldn't have been, but it was. And then nothing was said about it. But in August, I think the 31st, she was arrested again for trespassing. And then again on September the 7th, I believe it was. So finally it came around to—the tempo of this thing just kept picking up and picking up, until it was becoming quite a disturbing thing."

See also 310 F.2d 141 (1962), and D.C., 35 F.R.D. 516 (1964).

8. On October 7, 1963 Superintendent Marshall called plaintiff to his office and explained that he was relieving her on that date of all of her teaching duties, and was recommending to the board of trustees that she be discharged for cause for the reasons stated in his letter to her of even date which is set out hereinabove in full. He delivered the letter to her at that time. She thereupon notified Superintendent Marshall that she requested a hearing before the Board of Trustees. Before the Board met on October 14, several thousand students boycotted the school, school transportation was disrupted, and there was picketing of the school grounds, all incited by plaintiff's discharge.

9. On October 14, 1963 plaintiff attended a hearing which she had requested and which was granted by defendant Board of Trustees. She was represented by counsel but was not permitted to take into the hearing room a court reporter who had been retained to obtain a record of the proceedings. At the hearing plaintiff was given an opportunity to make a statement, but she was not asked any questions by the board members or their attorney. Neither was she permitted to question the board about the reasons for her discharge.

10. Plaintiff was discharged from her teaching job by the Board of Trustees for the reasons enumerated in paragraphs Nos. 1, 2, and 3 of Superintendent Marshall's letter of October 7, 1963, supra. Plaintiff was never advised of any other reasons intimated by Superintendent Marshall in his letter when he stated that his recommendation was based upon the reasons stated in said two paragraphs as well as "among other things". At the hearing Superintendent Marshall testified that in September 1963 in the early part of the school year plaintiff without proper permission left three afternoon sessions of a teacher workshop early in order to attend Civil Rights meetings, thereby intimating that her civil rights activities were inpairing and interfering with her teaching duties. Such suggestion is completely negatived by the balance of the record in the case, including Superintendent Marshall's deposition and the deposition of John H. Pearson who was principal of the Whitaker Elementary School in which plaintiff was teaching. The latter stated that plaintiff was one of his better classroom teachers, who possessed a good working relationship with him and the other teachers, and that she had never been a cause of complaints from the parents. Thus, defendants apparently seek to have the court consider reasons for plaintiff's discharge which were not considered by the Board of Trustees at the time it saw fit to discharge plaintiff "for cause". This the court cannot do.[4] Defendants' discharge of plaintiff and their failure to rehire her must be viewed by the court in the light of the matters before the board as recommended to it by Superintendent Marshall, as contained in his letter of October 7, 1966. There is no evidence of record to indicate that any other considerations were before the Board in this connection.

---

4. In Johnson v. Branch, 364 F.2d 177, decided June 1966 by the Fourth Circuit Court of Appeals, the Court quoting from SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) stated: "It is 'a simple but fundamental rule of administrative law * * * that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action soley by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside for the administrative agency.' Similarly the district court may not usurp the discretionary power of the school board but must judge the constitutionality of its action on the basis of the facts which were before the Board and on its logic."

## CONCLUSIONS OF LAW

■ At the time defendants' counsel filed his brief with the court on August 15, 1966, he also filed a motion to dismiss plaintiff's action for lack of jurisdiction upon ground "that plaintiff has not exhausted either the administrative or judicial remedies provided her under Article 2, Chapter 9, 1962 Code of Laws for South Carolina § 21–247 et sequa." Since plaintiff's cause of action invokes the jurisdiction of this court to secure and protect constitutional rights allegedly guaranteed to her under the United States Constitution she should not be denied her day in this court while she undertakes to exhaust inadequate or ineffective state remedies. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). Since it is by no means clear that South Carolina law provides plaintiff with an administrative remedy sufficiently adequate to preclude prior resort to federal court for protection of her constitutional right [5] the court concludes that it has proper jurisdiction of plaintiff's cause of action and defendants' motion to dismiss for lack of jurisdiction is therefore overruled.

Under the statute law of South Carolina, School Boards of Trustees are charged with the responsibility and have the duty to employ and discharge teachers. Section 21–230(2) of the 1962 Code of Laws for South Carolina provides:

"General powers and duties of school trustees.—The board of trustees shall also: [2] *Employ and discharge teachers.* Employ teachers from those having certificates from the State Board of Education, fix their salaries and discharge them when good and sufficient reasons for so doing present

themselves, subject to the supervision of the county board of education."

■ This court is fully aware that under the laws of South Carolina the boards of trustees have the full responsibility of operating the public school systems and it has no inclination to substitute its powers and judgment for that of the school boards. These powers inherently include within specified limits the free right to hire, discharge for good and sufficient reason, and refuse to rehire for a succeeding school year. There is no right of tenure provided for public school teachers under the South Carolina law. Surely the Boards of Trustees under our law are given discretionary power within the area of reason to discharge a teacher for cause when legally justifiable grounds exist, and to determine whether to continue such employment beyond the year in which a teacher has a contract. The court further recognizes that school authorities indeed have a duty to the public to maintain close scrutiny and supervision of all teachers at all times to insure their fitness and competence for the important task of educating young and impressionable students. The awesome responsibility and the manifold problems of public school administrators throughout the entire United States and especially in our area of the country are increasing and being compounded from day to day as the law of the land develops in the vital area of civil and human rights. The task of our public school officials, like that of most other public servants is not an easy one.

■ In determining the qualifications and fitness of public school teachers, school administrators must look at the whole person, both in and out of the classroom. The Supreme Court has aptly

5. S.C.Code Ann. § 21–230(2) (1962) subjects school board of trustees to the supervision of the Count Board of Education. The primary authority on the construction of this section by the South Carolina Supreme Court is In Re School District No. 4, etc. (1929), 153 S.C. 222, 150 S.E. 776, which extensively limits the role of the County Board in the employment or discharge of teachers. Since the County Board has only the "power to confirm or reject" the decision of the Board of Trustees it is extremely doubtful that it would have administrative power to reinstate the plaintiff in this instance. See also Williams v. Sumter County School Dist. No. 2, 255 F.Supp. 397 (D.S.C. June 15, 1966).

declared that fitness for teaching depends on a broad range of factors, and that there is no requirement in the Federal Constitution that classroom conduct must be the sole basis for determining fitness. Beilan v. Board of Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958).

In Garner v. Los Angeles Board of Public Works, 341 U.S. 716, at page 720, 71 S.Ct. 909, at page 912, 95 L.Ed. 1317 (1951), the United States Supreme Court said:

> "We think that a municipal employer is not disabled because it is an agency of the State from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for the public service. Past conduct may well relate to present fitness; past loyalty may have a reasonable relationship to present and future trust. Both are commonly inquired into in determining fitness for both high and low positions in private industry and are not less relevant in public employment."

In the later case of Adler v. Board of Education, 342 U.S. 485, 493, 72 S.Ct. 380, 385, 96 L.Ed. 517 (1952), the Court again stated, in adhering to the principles previously announced in *Garner,* supra:

> "A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted. One's associates, past and present, as well as one's conduct, may properly be considered in determining fitness and loyalty."

 It would thus seem that in the exercise of its discretion in discharging and rehiring public school teachers school boards have the right, and duty,

to consider a broad range of factors other than classroom conduct. However, such discretionary power must not be exercised in an arbitrary, capricious or discriminatory manner. So that no public school teacher may be deprived of those personal liberties secured by the United States Constitution the discretion exercised by the school boards must be within reasonable limits, so as not to curtail, impinge or infringe upon the freedom of political expression or association, or any other constitutionally protected rights.

In Johnson v. Branch, 364 F.2d 177, decided June 1966 by the Fourth Circuit Court of Appeals, which is a case involving a North Carolina public school teacher and is factually quite similar to the instant case, wherein the board of trustees failed to reemploy the plaintiff, such action being affirmed by the district court, the Fourth Circuit in reversing the lower court found that the board of trustees had acted arbitrarily, capriciously, and in a discriminatory manner in refusing to renew the plaintiff's contract, and held that the facts before the board were insufficient reasons for failing to rehire her. It ordered that she be reinstated to her former teaching position and that she be made whole for the damages she had suffered as a result of the wrongful refusal to rehire her.

The basic question to be determined by this court is whether or not the defendant Board of Trustees exercised a reasonable discretion in discharging plaintiff for cause on October 15, 1963 for the reasons stated in Superintendent Marshall's letter of October 7, 1963, supra, and in failing to rehire her for the subsequent school years 1964–65, 1965–66 and 1966–67, after plaintiff had commenced this action against the defendants demanding that she be reinstated to her teaching position with the defendant school district.

 This court is loathe to interfere or override any actions of a public administrative body in the exercise of its discretionary powers and functions

except in the clearest of cases. However, after a careful consideration of the record herein and the applicable controlling decisions of the United States Supreme Court and the Fourth Circuit Court of Appeals by which this court is irrevocably bound, this court must conclude upon the record before it that plaintiff was discharged by the defendant Board without "good and sufficient reasons for so doing." Neither were such reasons sufficient justification to warrant the Board in failing and refusing to rehire plaintiff to her teaching position in the subsequent years. Johnson v. Branch, supra; Franklin v. School Board of Giles County, 360 F.2d 325 (4th Cir. 1966); Garner v. Board of Public Works, 341 U.S. 716, 71 S.Ct. 909 (1951); Williams v. Sumter School District No. 2, 255 F.Supp. 397 (D.S.C. 1966). The court concludes that the Board's action was based upon the exercise by plaintiff of her constitutionally protected rights and privileges. Her discharge by the Board and its failure to rehire her were based upon improper, illegal and constitutionally proscribed considerations, which resulted in an unwarranted and discriminatory exercise of its discretionary powers.

■ Ground 1 as set forth in Superintendent Marshall's letter upon which the Board's action was based stated:

"(1) You were a leader and spokesman of a group of approximately two hundred demonstrators who breached the peace of the community on September 28, 1963, and that your conduct was such that it encouraged juveniles to break the law, jeer at policemen, promote violence, and disturb good order and public tranquility."

Attention is invited to Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), in which the Court was dealing with first amendment freedoms when it stated: "The Fourteenth Amendment does not permit a State to make criminal the peaceful expression of unpopular views". The facts supporting the State conviction in *Edwards* were much stronger than in plaintiff's "breach

of peace" conviction of September 28, 1963. Therefore, such activities on the part of plaintiff were constitutionally protected rights and could form no valid basis for her discharge from her teaching position by the School Board.

■ Ground 2 of Superintendent Marshall's letter stated:

"(2) You have been arrested a number of times recently for trespassing on the property of other people, including once in Orangeburg on August 31, 1963, and once in Charleston on June 13, 1963."

In reference to plaintiff's said trespass violations, appeals were taken from the guilty verdicts in each instance and were outstanding when the Civil Rights Act of 1964 was signed into law. In Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964), the Court had before it an appeal from these same types of trespass violations (S.C. Code Ann. § 16–388 (1962)). The Court found that the Civil Rights Act did not work a technical abatement of such convictions, but held that the Act abated the same by substituting a *right* for a *crime*. The Court said:

"Future state prosecutions under the Act being unconstitutional and there being no saving clause in the Act itself, *convictions for pre-enactment violations would be equally unconstitutional* and abatement necessarily follows." (Emphasis added.) 379 U.S. at 315, 85 S.Ct. at 391.

■ Ground 3 of Superintendent Marshall's letter stated:

"(3) You were arrested on September 7, 1963, for distributing handbills on the streets of Orangeburg in violation of a city ordinance."

The record reveals that plaintiff was arrested by the Orangeburg City Police on September 7, 1963 prior to her discharge for violating the following City Ordinance which was enacted January 4, 1961:

"102–3. Handbills—

"It shall be unlawful for any person to distribute, scatter, place, or cause

to be distributed, scattered, or placed, upon the streets, parks or public places of the City, any advertisement, handbill, dodgers, card, bulletin or other printed matter except and unless such advertisements, herein mentioned shall be placed, put or delivered into buildings or automobiles."

The above Ordinance was published as a public notice in the local newspaper by A. T. Brown, City Administrator, on August 29, 1963 advising that violators when apprehended would be prosecuted. Plaintiff's violation of this Ordinance and her subsequent arrest as a result thereof also afforded no valid or justifiable basis for her discharge. Near v. State of Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

The handbills distributed by plaintiff allegedly constituting a violation of the foregoing ordinance gave notice of a mass civil rights meeting and urged Negroes not to shop in the downtown stores that practiced segregation. This court is unwilling to pass collaterally upon the constitutionality of such ordinance since it appears that plaintiff's conviction thereunder is still on appeal. However, it is obvious that if the ordinance is broad enough to cover plaintiff's activities on that occasion, it is unconstitutional. Therefore, her arrest and conviction for such alleged violation were patently infringements of her constitutional rights.

Based upon the foregoing, the court is required to conclude that plaintiff is entitled to be paid by defendant school district the balance of her salary from October 15, 1963 until the end of that school year in the amount of $4064.61, together with interest thereon from June 1, 1964 until paid. Plaintiff is also entitled to be reemployed as a teacher in defendant school system in the same teaching position which she formerly held, or in a position of equal status and pay range as she enjoyed at the time of her discharge. It is therefore

Ordered that defendants, their agents, employees and successors be, and they are hereby enjoined from withholding from plaintiff the sum of $4064.61, together with interest thereon at the rate of six percent per annum since June 1, 1964. It is further

Ordered that defendants, their agents, employees and successors immediately re-employ, or offer to employ, plaintiff in defendant school system in the same position which she held at the time of her discharge if such position is now available. If such position is not now available, then she shall be employed, or offered employment, in a position in said district of equal status and pay range as soon as such a vacancy exists; and such employment if accepted by plaintiff shall be continued by defendants without regard to plaintiff's exercise of constitutionally protected activities in the civil rights field.

Let judgment be entered accordingly, with costs to plaintiff.